# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Nov 21, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  23  MJ  211 |
| Records and information associated with the following cellular telephone number (414) 708-8210, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2119; 924(c); 844 (i); & 844(h) | Carjacking; Use of a firearm during the commission of a violent crime; Use of fire to damage property affecting interstate commerce; & Use of fire in furtherance of a federal felony. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of   30   days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Digitally signed by RickHankins409017232-92997 DN: c=US, o=Sprint, ou=External, ou=eSite, cn=RickHankins409017232-92997 Date: 2023.11.20 13:59:33 -06'00'*

*Applicant's signature*

Rick Hankins, ATF SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:   11/21/2023

*Judge's signature*

City and state:   Milwaukee, WI                     Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application for a search warrant for records and information associated with the following cellular telephone number (the **"Target Cellphone"**): (414) 708-8210. These records are stored at premises controlled by Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 1095 Avenue of the Americas, New York, NY 10036, also described in Attachment A.  The information to be searched is described in the following paragraphs and in Attachment B.

2.      This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Provider to disclose to the government subscriber/call detail information and historical location data (including cell-site data) maintained by the Provider as further described in Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony) have been committed by multiple co-conspirators, to include **Zachary**

1

**BEHRMAN-MCDONALD**.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

4.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

5.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

6.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure authority.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

7.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 300 fire scene examinations and have testified as an expert. Additionally, I

2

have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,600 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 223 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

8. This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience. Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device. I have previously applied for and received search and arrest warrants related to the crimes of arson and unlawful firearm possession, as well as other crimes. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

9. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

3

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

<u>**PROBABLE CAUSE**</u>

10.     In this application I will describe a robbery and shooting that took place February 19, 2023 and the investigation which led to my belief that the robbery was planned and executed by at least 6 individuals, including Zachary "sheisty" BEHRMAN-MCDONALD who used TARGET CELLPHONE at various times up to and after the robbery. The individuals involved also included Alfredo ACOSTA, who ended up a shooting 'victim' due to the incident.  This investigation has also led me to conclude that BEHRMAN-MCDONALD used the TARGET CELLPHONE to communicate with his co-conspirators regarding the alleged crimes.  Historical records and location data from February 1, 2023 to March 16, 2023 will aid in showing BEHRMAN-MCDONALD whereabouts around the time of the crime.

11.     On February 19, 2023, at approximately 5:43AM, the Milwaukee Police Department responded to a shooting near 1727 West Mineral Street, Milwaukee, Wisconsin **("Location 1")**.  Upon their arrival, police subsequently located Alfredo ACOSTA, who had been shot multiple times.  ACOSTA was found lying on the front porch of XXXX South 18th Street and transported to a hospital.

12.     The Milwaukee Police Department later interviewed ACOSTA who stated he and his friend, C.B., were at Potawatomi Casino and then went to a party near South 34th Street and West Pierce Street in Milwaukee **("Location 2")**.  ACOSTA said he was driving a Chrysler 300 car that had been rented by his brother, who was later identified as M.A.  As he and C.B. left the party and were walking to the Chrysler 300, ACOSTA said they were approached by 5 unknown black males wearing ski masks and carrying firearms.  ACOSTA stated he was struck multiple

4

times in the head by the suspects' firearms while the suspects demanded to know where "the money was." ACOSTA stated he told the suspects he did not know what they were talking about. ACOSTA further said the suspects went through his pockets and took his money, necklace, grills, cellphone [phone # (262) 283-2021], and keys to the Chrysler 300 rental car. ACOSTA said he and C.B. were then forced at gunpoint into the suspects' white SUV. ACOSTA stated the suspects drove him and C.B. to C.B.'s address after C.B. provided his address. ACOSTA said the suspects exited the SUV at one point, at which time he exited the SUV and attempted to run away. ACOSTA stated he heard multiple gunshots and was struck multiple times in his leg, ankle, and foot. ACOSTA believed C.B. was targeted for the robbery because C.B. has posted social media videos in which C.B. had flashed a lot of money.

13. The Milwaukee Police Department also interviewed C.B, who was located at his residence - XXXX West Mineral Street. C.B. stated he posted a message on Facebook on February 18, 2023, asking if anyone wanted to go out. C.B. said he received a phone call from ACOSTA, who he has known since high school. C.B. stated he and ACOSTA made plans to go out together. C.B. said ACOSTA picked him up in a 4-door Chrysler rental car. C.B. stated he, ACOSTA, and their friend M.H. first went to Element Nightclub in downtown Milwaukee and then to Potawatomi Casino. While at the casino, C.B. stated he received a phone call from a female he knew as "Pat" who invited him to a party near South 34th Street and West Pierce Street in Milwaukee. C.B. further said he is friends with "Pat" on social media. C.B. stated he and ACOSTA dropped Michael at home before going to the party. C.B. said he and ACOSTA stayed at the party for approximately 45-60 minutes and then left. As they were approaching ACOSTA'S Chrysler rental car, C.B. said two unknown vehicles stopped by them and five unknown male suspects (suspects) exited one of the vehicles. All five were wearing masks. C.B.

5

further said the masked suspects pointed firearms at C.B. and ACOSTA and C.B. was struck in the head with firearms prior to being forced into the suspect vehicle. C.B. said the suspects went through his pockets and took $200 cash and his Apple iPhone. C.B. said the suspects asked where they lived and C.B. provided his home address – XXXX West Mineral Street. C.B. further said ACOSTA fled the vehicle when they arrived at his address, so he also fled from the vehicle, ran into XXXX West Mineral Street, and did not come out until police arrived.

14. The Milwaukee Police Department recovered (24) 9mm ammunition casings from the shooting scene near 1727 West Mineral Street.

15. On February 19, 2023, at approximately 6:45AM, the Milwaukee Police and Fire Departments responded to a vehicle fire at 227 East Townsend Street, Milwaukee, Wisconsin **("Location 3")**. The burned vehicle was identified as a 2020 grey Chrysler 300 with WI license plate #11294AFT (VIN # 2C3CCAGG3LH146281), which was the same vehicle rented on February 18, 2023, by M.A. from Enterprise Car Rental located 5300 South Howell Avenue in Milwaukee, Wisconsin. A 911 caller stated they observed a black male suspect standing near the vehicle within seconds of the vehicle being engulfed in flames. The black male was wearing black clothing with a black face mask. Under these circumstances, I believe the rental car was a vehicle used in interstate commerce that was intentionally destroyed by means of fire.

16. On February 28, 2023, ATF interviewed C.B. and C.B. stated the party near 34th Street and Pierce Street was held inside a photography studio on the first floor of a commercial building. C.B. used digital Google Streetview images on Your Affiant's cellphone and initially identified 3530 West Pierce Street as the building where the party was held. Additionally, C.B. said an unknown Hispanic male traveled with C.B. and ACOSTA to the party. C.B. stated the unknown Hispanic male was an associate of ACOSTA who they ran into earlier that same night.

6

17.     Also on February 28, 2023, ATF Agents canvassed the area of 3530 West Pierce Street and found that address to be a U-Haul self-storage building. ATF Agents then contacted a remodeling construction crew that working at the commercial building located at 3600 West Pierce Street. The construction crew stated that 3600 West Pierce Street had a photography studio on the first floor, which was unlocked and open. ATF Agent also contacted a resident at XXXX South 36th Street who had exterior surveillance cameras that faced toward the intersection of West Pierce Street and South 36th Street, and also captured the front door of 3600 West Pierce. Agents viewed the surveillance video from February 19, 2023, and observed the 2020 Chrysler 300 arrive at approximately 4:36AM and park immediately across the street from the front door of 3600 West Pierce Street. Three individuals exited the Chrysler and subsequently entered 3600 West Pierce Street. The surveillance video also captured a white Jeep SUV travel by 3600 West Pierce Street on three occasions between 4:43AM and 4:46AM. What appeared to be the same white Jeep SUV backed into the north/south alley between 3600 West Pierce Street and 3530 West Pierce Street at approximately 4:54AM. The surveillance camera showed C.B., ACOSTA, and the unknown male exit 3600 West Pierce Street at approximately 5:17AM and walk to the Chrysler 300. ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video showed suspects remove the shirt from C.B. and leave it in the road. The video further showed C.B. and ACOSTA were ushered by the suspects into the white Jeep SUV while the unknown third male appeared to be placed in the Chrysler 300. The white Jeep SUV then traveled south on South 36th Street followed by the Chrysler 300, which was presumably driven by a suspect.

7

18.     On March 1, 2023, ATF interviewed Alfredo ACOSTA.  ACOSTA offered the following summary of the evening that led up to his shooting:

19.     ACOSTA stated he picked up C.B. and M.H. at C.B.'s house and they all went to Element night club and bar hopped.  When he and C.B. left leaving an afterparty later that night, ACOSTA stated that 5-6 guys wearing masks rushed them and placed them in a suspect vehicle. Your Affiant asked ACOSTA what happened to the 3rd male in his vehicle that was also at the afterparty.  ACOSTA said he didn't recall a 3rd person in his vehicle that went to the afterparty with him and C.B. After the robbery, ACOSTA stated that the mother of his children called his cellphone number to see if he could retrieve his belongings.  ACOSTA said the calls would keep ringing with no answer.  While in the suspect's car, ACOSTA said he was thinking of ways to get out of the situation.  When the suspects subsequently got out of the vehicle, ACOSTA said he saw his opportunity, so he got out and ran.  ACOSTA stated the suspects chased him and he heard several gunshots and was hit 5 times.  ACOSTA said that the suspects drove to C.B.'s house and parked near the middle of the street and he heard something about another car being there.  ACOSTA said the driver and front passenger got out of the suspect vehicle and is not sure where they went.  ACOSTA further stated that suspect seated next to him in the backseat later climbed into the driver seat after a vehicle passed by the suspect vehicle.  ACOSTA said the backseat suspect that had climbed into the driver seat pulled the vehicle forward and honked the horn (because of the unknown vehicle that passed by), at which time the two suspects that had exited the suspect vehicle ran back to the vehicle.  ACOSTA stated he jumped out of the backseat as the two suspects were returning to the vehicle.  ACOSTA said after he fell to the ground from being shot, he got back up and ran on a broken ankle and hid under someone's porch.  Acosta said he subsequently knocked on a door and asked them to call an ambulance. ACOSTA said the

8

suspects had asked for a specific wristwatch owned by ACOSTA that ACOSTA was not wearing on the night of the robbery. When asked, ACOSTA said he has worn that wristwatch in photographs that he posted to Facebook. ACOSTA stated his Facebook profile name was "Alfredo Acosta" and included an image of him turned away from the camera. Acosta further said his Facebook account was open on his cellphone when the suspects took it. Your Affiant later located ACOSTA's Facebook account through open search and observed ACOSTA's profile image (Facebook ID #100004126687957). ACOSTA said he, C.B., and M.H. also went to Potawatomi Casino on the night of the robbery. ACOSTA said C.B. and M.H. went into the casino while ACOSTA went to drop off a girl he had met at Silk nightclub.

20. Based on my training and experience, individuals carry their cellular phones on their person or in a very close vicinity whether it is day or night. Further, most individuals have their own cellular phones, so it is likely the subject(s) cellular phone is using and/or registering with the cellular tower providing service in the general geographic area of the crime.

21. On March 9, 2023, Your Affiant received records from T-Mobile related to Federal search warrant #23-M-303. The records included Timing advance "True Call" data related to devices that were within the vicinity of the three aforementioned crime locations in Milwaukee, those being 3600 W. Pierce Street (Location 2), 1727 W. Mineral Street (Location 1), 227 East Townsend Street (Location 3). Based on the aforementioned query of T-Mobile data and subsequent analysis, only one phone number, (414) 975-7826, was found to be in the area of locations #1 (the shooting), and #2 (the kidnapping).

22. The account for (414) 975-7826 is listed to Kentreal EVANS at 3618 North 14th Street, Milwaukee, WI 53206 with an activation date of November 29, 2022. This account was terminated on March 11, 2023.

9

23. Your affiant compared Wisconsin DOC archived inmate recorded calls placed by EVANS while he was incarcerated in 2022 to the T-Mobile call detail records for (414) 975-7826 and found at least 2 contacted numbers that overlapped enough within the two sets of records to make Your Affiant conclude that EVANS was likely in possession of (414) 975-7826 on February 19, 2023.

24. A review of the call detail records provided by T-Mobile showed that cellphone number (414) 975-7826 [EVANS] had multiple contacts with cellphone number (414) 526-1156 and (414) 788-9051 on February 18, 2023. A further review of the call detail records also showed EVANS had contacts with cellphone number (414) 309-9038. The users of (414) 526-1156 and (414) 309-9038 have been identified as likely being Geo OWENS and Jhony MARCHENA respectively, as described below—however the user of (414) 788-9051 remains unknown beyond the nickname "Tre".

25. Your Affiant searched the Wisconsin Department of Corrections (DOC) Inmate Solutions system and found that (414) 526-1156 was associated in that database with Geo OWENS, 4151 North 12th Street, Milwaukee, Wisconsin.

26. Your Affiant further reviewed recorded Milwaukee County Jail calls and located a call placed by inmate #2022007557 on January 17, 2023, at 1:34PM to (414) 526-1156. In that call, the inmate referred to the male who answered the phone as "Geo". Your Affiant also obtained records from AT&T related to Federal search warrant #23-889M related to (414) 526-1156. According to AT&T records, (414) 526-1156 is registered to a "Rick James" at 4919 West Capitol Drive, Milwaukee, Wisconsin. A query of that name and address did not produce results. The email linked to the AT&T account is WUZYMOO@yahoo.com,

which is an email associated with Geo OWENS (DOB:10/15/1997) according to a query of the law enforcement database TLO. The AT&T account has been active since June 11, 2021.

27. Based on the above information, I believed (414) 526-1156 to be possessed by Geo OWENS on February 19, 2023.

28. Your Affiant also queried number (414) 309-9038 in TLO, which is an online law enforcement database after this number was found to be in the call detail records for 414-975-7826 during the matters under investigation on February 19, 2023. TLO search results showed that number (414) 309-9038 was associated with Jhony MARCHENA (DOB: 2/23/2002) at 3402 North 23rd Street, Milwaukee, Wisconsin. Your Affiant further reviewed a recorded DOC call placed by inmate #666785 to (414) 309-9038 at 12:43PM on January 19, 2023, and a male answered the call. In that call, the male explained to the inmate that the male had court on that same date and that he was trying to combine his criminal cases so that he could get a combined sentence. A query of Wisconsin CCAP showed that Jhony MARCHENA was in Milwaukee Circuit Court on January 19, 2023, regarding two separate open felony cases: 2022CF003603 (unlawful possession of a firearm, bail jumping, and possession of THC with intent), and 2022CF002146 (unlawful possession of a firearm and resisting arrest).

29. Based on the above information, I believe cellphone number (414) 309-9038 was likely possessed by Jhony MARCHENA on February 19, 2023.

30. On June 1, 2023, ATF executed Federal Search Warrant #23-MJ-122 at the residence of Jhony MARCHENA located at 9070 North 86th Street, Milwaukee, Wisconsin, which was signed by Magistrate Judge William Duffin. ATF located an iPhone 13 Pro Max with the ID of Jhony MARCHENA. The data extraction of the iPhone 13 Pro Max was

11

initiated by Waukesha Police Department Detective David Feyen on or about June 9, 2023, pursuant to Federal Search Warrant #23-M-380 signed by Magistrate Stephen Dries.

31.     The following is a summary of information located on the iPhone 13 Pro Max cellphone (ATF Item #40) located with MARCHENA'S ID:

32.     The cellphone data showed it was activated with cellphone number (414) 309-9038 and included IMSI #311480724551071.  Among other things, the data extraction also showed that MARCHENA'S iPhone 13 Pro Max had been used to access the following Facebook account: "Jayy RackedUp" with Facebook ID #100040453024988.  A review of publicly available images posted to "Jayy Racked Up" showed multiple images that matched the likeness of Jhony MARCHENA.  Specifically, there was an image posted on February 19, 2023, of Jhony MARCHENA sitting inside a vehicle.

33.     The contact list on MARCHENA'S iPhone 13 Pro Max included the following pertinent phone numbers:

> "Trelly" – (414) 975-7826 [Previously associated with Kentreal EVANS]
>
> "Gts G" – (414) 526-1156 [Previously associated with Geo OWENS]
>
> "Gee" – (305) 342-6049 [Subsequently associated with Geo OWENS]
>
> "Lil Tre" – (414) 788-9051
>
> "Lil Tre" – (414) 779-2527, which was created on 2/6/2023.
>
> "Lil Bro Monti" – (414) 399-4919
>
> "Quis" – (414) 397-2342, which was created on 12/30/2022.
>
> "Quis" – (414) 779-7848, which was created on 2/24/2023.
>
> "Fredo2" – (262) 283-2021, which was created on 1/16/2023 [ACOSTA's phone number, per Charter Communications, see below]
>
> "Zach" – (414) 708-8210 (**Target Cellphone)**

12

34.    The contact list from the iPhone included both the apparent accounts of the shooting victim [ACOSTA] and two of the suspected conspirators [OWENS and EVANS]:"Alfredo Acosta" – Facebook ID #100004126687957; "fredo_100" – Instagram ID #414923653; "Lilg Globaltrapstar" – Facebook ID #100000147312664.

35.    Your Affiant further reviewed text messages between MARCHENA and Kentreal EVANS aka "Trelly" at (414) 975-7826, which begin on 2/19/2023 at 2:15PM.

36.    These texts between MARCHENA and EVANS included an exchanges on 2/25/2023 and 2/26/2023 in which MARCHENA seeks EVANS' help in apparent potential robberies—each time describing targets he was observing and describing the potential "move".

37.    MARCHENA'S cellphone data also included a Note created on 2/21/2023 at 9:39PM that appeared to be draft lyrics for a rap song. The rap lyrics included references to jumping out on people while wearing masks and carrying Glocks with switches. MARCHENA also created a Note on 1/20/2023 with apparent draft rap lyrics that included the phrase, "We ain't just rappin bitch yea we living all this shit" "And don't pass me no Glock unless that bitch gotta switch".

38.    Your Affiant reviewed records from T-Mobile that were previously obtained pursuant to Federal search warrant #23-890M related to cellphone number (414) 397-2342. The records review revealed that the shooting victim Alfredo ACOSTA may have possessed phone number (414) 397-2342 for a period of time on February 19, 2023, as further detailed below, but that number was also possessed by another person:

39.    Analysis of the T-Mobile Timing Advance data obtained for that cellphone number (ATF Item #26) showed that that number arrived at or near Potawatomi Casino at approximately 2:44AM on February 19, 2023, and then moved to the area of 1810 West

13

Wisconsin Avenue by approximately 2:48AM until it returned to the area of Potawatomi Casino by approximately 3:05AM and then traveled to the area of 1810 West Wisconsin Avenue. Cellphone number (414) 397-2342 stayed in the area of 1810 West Wisconsin Avenue until approximately 3:55AM and it became mobile and later arrived at or near the casino at approximately 3:56AM. The phone number then traveled away from the casino at or about 3:57AM. In their separate interviews, M.H., C.B. and Alfredo ACOSTA all stated that ACOSTA had dropped off the group at the casino, left and then returned to the casino. The movement of (414) 397-2342 to and from the casino on February 19, 2023, is consistent with that number being possessed by ACOSTA or someone that traveled near ACOSTA. Additionally, Your Affiant queried all Timing Advance data locations for (414) 397-2342 for the available dates January 20, 2023 – February 19, 2023, and found a cluster of location indicators for that device at or near the listed home address of Alfredo ACOSTA - 4323 South 110th Street, Greenfield, Wisconsin.

40. There was no Timing Advance data recorded for (414) 397-2342 between 5:35AM – 7:08AM on February 19, 2023, which is consistent with that device being off during that time. When the device was powered on at 7:08AM, the Timing Advance data showed it to be at or in the area of 4151 North 12th Street, Milwaukee, Wisconsin, which was the listed residence of Geo OWENS. Alfredo ACOSTA was hospitalized at this time and did not possess the cellphone.

41. A query of the call history for (414) 397-2342 showed that it had the most frequent contacts with (414) XXX-6964, which is a number associated with a C.H. per TLO. C.H.'s listed address is XXXX East Cudahy Avenue, Cudahy, Wisconsin. The Timing Advance data for (414) 397-2342 showed that the device had multiple location indicators in the

14

area of XXXX East Cudahy Avenue.  The device also showed to be within approximately .2 miles of XXXX East Cudahy Avenue after 7:08AM on February 19, 2023, and the phone received incoming calls from (414) XXX-6964 on the afternoon of February 19, 2023.  The records for (414) 397-2342 also showed that all incoming calls beginning at 9:01AM on February 19, 2023, went to voicemail.

42.     Your Affiant interviewed C.H. in an attempt of identify "Quis", who was the listed name for (414) 397-2342 in MARCHENA'S cellphone.  C.H. said the father of her children was Marquis HARRIS (DOB:1/23/1997) who had a current cellphone number of (414) 779-7848, which was the most current contact number for "Quis" in MARCHENA'S iPhone.

43.     T-Mobile tower dump records showed that (414) 526-1156 [OWENS] called (414) 397-2342 [HARRIS] at 4:40AM and 4:57AM on February 19, 2023, while (414) 397-2342 was at or near 3600 West Pierce Street.

44.     On July 6, 2023, ATF re-interviewed C.B. and C.B. provided the following:

45.     C.B. stated that ACOSTA had dropped off C.B., M.H., and the third male at the casino and then ACOSTA left the casino.  C.B. said he recalled seeing a female in the car with ACOSTA at the casino at some point.  C.B. could not recall where or when the female got into the car.  C.B. said it was ACOSTA'S idea to go to the casino.  Your Affiant showed C.B. a Milwaukee Police Department booking photograph of Marquis HARRIS (DOB:1/23/1997) and asked if C.B had ever met the person in the photograph.  Upon seeing the photograph of HARRIS, C.B. immediately stated, "That's him!"  C.B. further stated that HARRIS was the fourth unknown male that was with C.B., ACOSTA, and M.H. on the night of the robbery.  C.B. said HARRIS was with him and M.H. at the casino.  C.B. also said HARRIS went to the

15

afterparty with C.B. and ACOSTA. C.B. further stated that HARRIS was in the front passenger seat of ACOSTA'S Chrysler 300 when ACOSTA first picked up C.B. and M.H. earlier that night at C.B.'s house before they went bar hopping together.

46. Your Affiant asked C.B. how confident he was that HARRIS was the previously unknown male that accompanied the group all night (including to the casino and afterparty). C.B. said he was "very confident" that HARRIS was the guy with them all night. C.B. further said he had met HARRIS on previous occasions through ACOSTA and knew HARRIS' face, so he was very confident. C.B. stated he thought HARRIS looked like he was part Hispanic in person, but his photograph made him look more African American. C.B. said he recalled ACOSTA call HARRIS a name that sounded similar to "Reece".

47. ATF specifically asked ACOSTA during his interview to identify the previously unknown third male who accompanied ACOSTA and C.B. to the afterparty and ACOSTA said he did not recall that a third person was with him and C.B.

48. C.B. also volunteered that he had seen HARRIS on previous encounters hanging out with a local rap artist by the name "Global Star" or something similar to that name. Your Affiant then showed C.B. a digital photograph of Geo OWENS from OWENS' Facebook page "Lilg Globaltrapstar". C.B. identified OWENS as the rap artist who C.B. has seen hanging out with HARRIS.

49. A query of (414) 399-4919 in the law enforcement database TLO showed that number to be a T-Mobile number associated with Damonti Lamar LOCKHART (DOB: XX/XX/2003) at 4280 South 43rd Street, Greenfield, WI.

50. LOCKHART'S cellphone number was also located in the following call detail records:

16

- T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #28)

- Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29)

- T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect (ATF Item #27)

- T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26)

- AT&T records for (414) 526-1156, which is a cellphone associated with Geo OWENS (ATF Item #25)

51. Your Affiant subsequently reviewed business records (to include call detail records, Timing Advance data, and cell tower data) previously provided by cellphone carriers (via legal process) to create a timeline summary of contacts and general locations of relevant cellphone devices related to the carjacking, abduction, shooting, and arson on February 19, 2023. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

52. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data, Global Positioning Device ("GPS") data or Timing Advance Data. Based on my training and experience, Timing Advance data provided by T-Mobile has a GPS accuracy radius that ranges from approximately 100-300 meters.

17

The following timeline summary[1] is a revision of the pre-existing timelines as result of additional analysis of cellphone records and information obtained from interviews. Specifically, I believe that Alfredo ACOSTA was in possession of two cellphones on February 18-19, 2023. In previous reports, Your Affiant believed ACOSTA possessed (414) 397-2342 on February 19, 2023. However, an additional interview and cellphone data analysis has shown that (414) 397-2342 was likely possessed by Marquis HARRIS on that date and that cellphone may have traveled for a period of time with ACOSTA or near ACOSTA. Additionally, ATF received call detail records from Verizon regarding number (213) 474-6888 that revealed this number had numerous contacts with the mother of ACOSTA'S children. Specifically, the mother of ACOSTA'S children called this number numerous times following the shooting which is consistent with ACOSTA stating that she called one of his phones after the shooting. Therefore, it is believed that (213) 474-6888 was possessed by ACOSTA on February 19, 2023.

53.     The following timeline is a summary and does not include all contacts or movements of the cellphone devices. The timeline has been condensed in an effort to detail the apparent connection of **Target Cellphone** to the alleged criminal activity.

---

[1] Information detailed in the subsequent timeline was derived from the following records: T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #12 and #28); AT&T records for (414) 526-1156, which is a cellphone number associated with Geo OWENS (ATF Item #24 and #25); Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29); T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect (ATF Item #27); T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26); Verizon records for (213) 474-6888, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #1* (ATF Item #51); Charter Communications records for (262) 283-2021, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #2* (ATF Item #23); T-Mobile records for cellphone tower dumps (ATF Item #10); T-Mobile records for (262) 402-0511, which is a cellphone number associated with C.B. (ATF Item #45); Surveillance video obtained near 3600 West Pierce Street (ATF Item #2); Interview of C.H.; Search of MARCHENA'S iPhone (ATF Item #40) seized during search warrant; T-Mobile records for (414) 399-4919, which is a cellphone associated with Damonti LOCKHART – (ATF Item #93)

***All times are for February 18, 2023***

| | |
|---|---|
| 7:05PM | ACOSTA cellphone #2 called C.B. for 459 seconds. |
| 7:11PM | OWENS and MARCHENA both attempted to call HARRIS cellphone. |
| 7:14PM | ACOSTA cellphone #1 initiated an Apple iPhone Facetime connection with OWENS until 7:19PM (ATF Item #83) |
| 7:19PM | ACOSTA cellphone #1 called HARRIS cellphone. |
| 7:31PM | LOCKHART called OWENS for 1:05 minutes |
| 9:48PM | Timing Advance data for HARRIS' cellphone showed it arrived in the area of downtown Milwaukee and stayed in that general area until approximately 2:24M on 2/19/2023. |
| 11:16PM | OWENS called HARRIS' cellphone for 201 seconds. |
| 11:37PM | OWENS called LOCKHART for 3:57 minutes |

***All times are for February 19, 2023***

| | |
|---|---|
| 12:09AM | OWENS called LOCKHART for 13 seconds |
| 2:44AM | HARRIS' cellphone arrived at or near Potawatomi Casino according to Timing Advance data. |
| 2:55AM | OWENS called HARRIS' cellphone. |
| 3:03AM | Timing Advance data for EVANS' cellphone showed it in the area of Potawatomi Casino and it stayed in the area of the casino until approximately 3:52AM. |

19

| | |
|---|---|
| 3:04AM | Timing Advance data for cellphone (414) 788-9051 showed it in the area of Potawatomi Casino until at least approximately 3:50AM. |
| 3:12AM | MARCHENA called LOCKHART |
| 3:33AM | OWENS called MARCHENA for over 4 minutes in an apparent 3-way call with HARRIS' cellphone while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 3:41AM | C.B., M.H., and HARRIS were on video at Potawatomi Casino. |
| 3:41AM | OWENS called MARCHENA for 208 seconds while MARCHENA utilized a cell tower and sector that provide coverage for an area that included Potawatomi Casino. |
| 3:47AM | MARCHENA called OWENS while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 4:16AM | OWENS called MARCHENA while MARCHENA utilized a cell tower and sector that provide coverage for an area that included 3600 West Pierce Street. |
| 4:17AM | Surveillance video near 3600 West Pierce Street captured images of a white Jeep SUV travel eastbound on West Pierce Street. |
| 4:17AM | T-Mobile Timing Advance data showed EVANS' cellphone, as well as (414) 788-9051, were in close proximity to 3600 West Pierce Street at this time and then both devices subsequently traveled east. |
| 4:33AM | T-Mobile Timing Advance data showed HARRIS' cellphone had traveled west from West National Avenue and South 21st Street. |

20

| | |
|---|---|
| 4:33AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included 3600 West Pierce Street. |
| 4:36AM | Surveillance video near 3600 West Pierce Street captured the arrival of the 2020 Chrysler 300 that was driven by Alfredo ACOSTA and also occupied by C.B. and HARRIS. |
| 4:36AM | Timing Advance data showed that HARRIS' cellphone arrived near 3600 West Pierce Street and stayed in that area until approximately 5:19AM. |
| 4:38AM | Surveillance video captured the three occupants of the 2020 Chrysler 300 enter 3600 West Pierce Street. |
| 4:40AM | OWENS called HARRIS' cellphone for 75 seconds. |
| 4:42AM | OWENS called MARCHENA while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 4:43AM-4:46AM | Surveillance video captured a white Jeep SUV travel by 3600 West Pierce Street on three separate occasions. |
| 4:54AM | Surveillance video captured images of a white Jeep SUV parked in the alley immediately east of 3600 West Pierce Street. |
| 4:54AM-5:19AM | Timing Advance data showed EVANS' cellphone and (414) 788-9051 were in close proximity of 3600 West Pierce Street. |
| 4:57 AM | OWENS called HARRIS' cellphone while that number was at or near 3600 West Pierce and OWENS was utilizing a cell tower located at 3950 North Holton Street, Milwaukee which was over 7 miles northeast of 3600 West Pierce Street. |

*There is no activity on HARRIS' cellphone from 4:57AM – 9:01AM*

| | |
|---|---|
| 4:57:56AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 5:17AM | Surveillance video captured images of ACOSTA, C.B., and HARRIS exit 3600 West Pierce Street. The three males walked toward the Chrysler 300 and ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video further showed C.B. and ACOSTA were ushered by the suspects into the white Jeep SUV while HARRIS appeared to be placed in the Chrysler 300 along with one suspect from the white Jeep SUV |
| 5:19AM | Surveillance video captured images of the white Jeep SUV and the Chrysler 300 travel southbound on South 36th Street and out of frame. |
| 5:19AM | Timing Advance data for EVANS, HARRIS' cellphone, and (414) 788-9051 showed that all three devices traveled away from 3600 West Pierce Street at this time. |
| 5:21AM | Timing Advance data showed that HARRIS' cellphone was in the area of 35th Street and I-94. |
| 5:21AM | Timing Advance data for EVANS' cellphone showed that this device was in the area of North 41st Street and I-94, Milwaukee. |
| 5:22AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included I-94 immediately north of American Family Field and while (414) 788-9051 was also in that same general area. |
| 5:24:02AM | MARCHENA's cellphone password was entered to pair the cellphone with an unknown vehicle Uconnect software system via Apple carplay. Uconnect is a software platform that can be found in the following vehicles: Chrysler, Dodge, Jeep, Wagoneer, Ram, and FIAT. |

22

| | |
|---|---|
| 5:31AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower that provided coverage to an area that included I-894 and (414) 788-9051 utilized a cellphone tower and sector that provided coverage to an area that included 1727 West Mineral Street. |
| 5:32AM-5:36AM | Timing Advance data showed that EVANS' cellphone was in the area of South 24th Street and Lapham Street, which was less than 1 mile southwest of 1727 West Mineral Street. |
| 5:33AM | Timing Advance data showed that HARRIS' cellphone was near the shooting scene at 1727 West Mineral Street. |
| 5:34AM | OWENS called (414) 788-9051 while OWENS utilized a cellphone tower and sector that provided coverage for an area that included 1727 West Mineral Street. |

5:35AM        Timing Advance data showed that HARRIS' cellphone was near 1727 West Mineral Street. There was no Timing Advance data available again for this number until 7:08AM, which is consistent with the device being turned off.5:42:20 AM        MARCHENA had an incoming call from (414) 788-9051.

| | |
|---|---|
| 5:38:53AM | Phone number (414) 788-9051 [Unknown suspect] initiated an Apple Facetime call with OWENS that lasted until 5:41:47AM. |
| 5:43AM | 911 call for shooting near 1727 West Mineral Street – C.B. and ACOSTA fled from the white Jeep SUV near this location. |
| 5:52:04AM | MARCHENA had an incoming call from (414) 788-9051. |
| 6:18:41AM | MARCHENA initiated an Apple Facetime call with OWENS that lasted until 6:18:58AM. |
| 6:35AM | MARCHENA called (414) 788-9051. |
| 6:35AM | LOCKHART called MARCHENA |

23

| | |
|---|---|
| 6:37AM | OWENS called EVANS while EVANS was located near North Oakland Avenue and East Kenmore Place and OWENS utilized a cellphone tower located at 3950 North Holton Street, which was less than 1.5 miles northeast of 227 East Townsend Street. |
| 6:37:31AM | EVANS initiated an Apple Facetime call with OWENS that lasted until 6:39:20AM. |
| 6:40AM | LOCKHART called (414) 364-9146 while both cellphones utilized a cell tower that provided coverage for an area that included 227 East Townsend Street, Milwaukee, Wisconsin. |
| 6:45AM | 911 call for vehicle fire at 227 East Townsend in Milwaukee – 2020 Chrysler 300 that had been stolen from ACOSTA at 3600 West Pierce. |

54. Based on the above timeline, I believe OWENS played a role in coordinating the carjacking on February 19, 2023, and subsequent crimes, and OWENS' knowledge and participation is supported by his cellphone's movement to the area of the shooting after the carjacking. I also believe the HARRIS and ACOSTA likely had prior knowledge of the carjacking and robbery based on the phone contacts with the people who appeared in the areas of the casino, the carjacking location, and the shooting location. I believe that HARRIS was associated with OWENS, MARCHENA, EVANS, LOCKHART, and the possessor of (414) 788-9051 because all of those numbers were in the call detail records for HARRIS. LOCKHART'S participation in the conspiracy is supported by his cellphone's apparent presence in the area of the vehicle arson as well as recorded jail calls that will be detailed later in this affidavit. The timing and sequence of calls, and the general locations of devices at critical times leads Your Affiant to believe there was a conspiracy to conduct the carjacking

24

and subsequent crimes on February 19, 2023, amongst the following persons and others: Geo OWENS, Jhony MARCHENA, Kentreal EVANS, the possessor of (414) 788-9051, Alfredo ACOSTA, LOCKHART and Marquis HARRIS.  I further believe that ACOSTA traveled with HARRIS' cellphone while HARRIS was at the casino.   The conspirators' crimes include violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

55.    Your Affiant previously obtained Meta Facebook records for Alfredo ACOSTA pursuant to Federal search warrant #23-MJ-140.  Those Meta Facebook records revealed a verified cellphone number for ACOSTA as (414) 940-1675.  Review of the Facebook records further revealed Facebook messenger communication between ACOSTA and C.B.  During the late evening hours of June 17, 2023, ACOSTA sent messages that encouraged C.B. to meet ACOSTA out somewhere, but C.B. was not able to meet ACOSTA.  During the early morning hours of June 18, 2023, ACOSTA and C.B. had the following exchange:

ACOSTA: "Quis here lol"

C.B.: "On wha lol u see him rn?"

C.B.: "Who he wit"

C.B.: "Shit crazy u in there wit a limp cus of dude bitch bum ass i stg im mad asb now😂🧝‍♀️♂️"

ACOSTA: "He deep too lol lol hoe ass nigga"

ACOSTA: "I should I act cool with his ass and set him Lmao chess not checkers"

C.B.: "I bet scary ass gon head be careful tho cus he damnear kno we know"

ACOSTA: "Bro I want beat bro so bad rn 🤣"🧝‍♀️"

25

56.     Your Affiant has reviewed a number of calls placed by and between various of the parties that were made using the Wisconsin Department of Corrections Inmate Solutions online calling system.  As will be detailed below, I believe in these conversations "Fredo" refers to Alfredo ACOSTA;  "sheisty" is Zachary BEHRMAN-MCDONALD (DOB:XX/XX/2002); "G" is Geo OWENS; "GTS Merk" or "Merk" is Marquis HARRIS and "Monti" is Damonti LOCKHART (DOB: 6/03/2003).  In sum, I believe these conversations show that ACOSTA was contacted by LOCKHART who admitted his involvement in and knowledge of the robbery and shooting.  Further, ACOSTA claimed that LOCKHART stated LOCKHART had a video of the shooting. I believe this video would most likely be contained within LOCKHART's cellphone.

57.     A query of the Wisconsin Department of Corrections Inmate Solutions online system showed that Wisconsin DOC inmate J.T. "Jay" called ACOSTA at (414) 940-1675 on September 19, 2023 at 8:06PM. A portion of the recorded jail call was spoken in Spanish and subsequently translated.  J.T. informed ACOSTA that he had met a male at Dodge Correctional Institution named "Sheisty" who claimed he knew ACOSTA.  The below is a summary of that recorded call between J.T. and ACOSTA:

JT: *SPANISH: I told him ENGLISH: yeah, that's my—I was like that's my big brother, why? What's up? SPANISH: He told me ENGLISH: nah, I'm cool with him, woo woo SPANISH: but he said like ENGLISH: he told me, like, that the only issue like they have with you or some shit was when that shit happened to you and shit, supposedly, G pulled up and was, like, oh why they did that shit to you 'cause supposedly everything he did or some shit. I said man, you know what I'm saying—I told him like—you can't, like, feel no type of way 'cause at the end of the day when –if you was to get hit, bro, you gon'-you gon' , you know what I'm saying, you gon' think bad about everybody around you, bro, you feel me? 'cause you know how you move and you don't expect that shit to really happen to you like that, unless it's people that's close to you, you feel me?*

ACOSTA: *He said—they said that, what? That G what?*

26

JT: *He said that supposedly, uh, G got on his ass 'cause --he said that supposedly he was thinking it was him and some other---and Monty/Monti that, uh, had, you know what I'm sayin', did that shit to you and shit.*

ACOSTA: *hmm*

JT: *And I was like, well—I was like well, I don't know my n—gga, like---*

ACOSTA: *SPANISH: Hey, are you with them right now?*

JT: *SPANISH: They are in the (unintelligible)*

ACOSTA: *Oh, okay, okay, okay*

JT: *SPANISH: Because they—they—they—they---they---when I got in here they— everyone tries to talk to me, bro, because when I enter places—the units—I don't talk to anyone, bro, I stay in my ENGLISH: lane*

ACOSTA: *SPANISH: Hey, don't give that asshole any information, you hear me?*

JT: *SPANISH: he's crazy, bro—*

ACOSTA: *ENGLISH: Hey, listen---hey, listen*

JT: *SPANISH: Tell me, tell me….*

ACOSTA: *SPANISH: It was them, you hear me? So be careful. They're going to try to talk to you and get information.*

58.     My interpretation of the above conversation is that J.T. informed ACOSTA that associates of "G" named "Sheisty" and "Monty/Monti"—that is to say associates of Geo Owens: BEHRMAN-MCDONALD and LOCKHARD—had something to do with shooting ACOSTA and ACOSTA confirmed those suspicions.

59.     Your Affiant also reviewed recorded jail calls placed by Zachary BEHRMAN-MCDONALD (DOB:XX/XX/2002) while he was incarcerated at Dodge Correctional

27

Institution between 8/04/2023 – 10/02/2023 and Oak Hill Correctional Institution between 10/02/2023 – 10/04/2023.  The following is a summary of downloaded phone calls placed by BEHRMAN-MCDONALD during this timeframe:

60.     On September 18, 2023, at 1:03PM, BEHRMAN-MCDONALD placed a recorded call to (414) 940-9151 and a male answered the call.  Phone number (414) 940-9151 is a phone number listed to Damonti LOCKHART at 4280 South 43rd Street, Milwaukee, WI according to the Wisconsin DOC Inmate Solutions payment history.  BEHRMAN-MCDONALD asked the male, "Guess who I'm in here with?" and the male asked who. BEHRMAN-MCDONALD explained he was in Dodge Correctional with "Jay" and "Jay" claimed to have been at the Milwaukee County House of Corrections with the male.  A query of Milwaukee County Jail records showed that Damonti LOCKHART (DOB: 6/03/2003) was at the Milwaukee County House of Corrections from May 27, 2023 until his release on GPS monitoring on August 23, 2023.  BEHRMAN-MCDONALD further said that Jay was with him at the time of the call.  BEHRMAN-MCDONALD further said that Jay is friends with "Fredo" and that "somebody got" Fredo.  BEHRMAN-MCDONALD also said, "You need to check-in with somebody, too cuz… he said they took the watch, the Cuban, 60k."  [Cuban is a known style for neck chains and ACOSTA reported a necklace was taken during the robbery]. LOCKHART originally appeared to not understand the reference that BEHRMAN-MCDONALD was making.  LOCKHART subsequently responded, "Ooh…never…remember, Chubby got the Cuban and they never did get something off (unintelligible)…they never made nothing off that shit…"  BEHRMAN-MCDONALD further said that Jay was telling him that "he" thought BEHRMAN-MCDONALD did "that" because BEHRMAN-MCDONALD "fucks with G".  BEHRMAN-MCDONALD also said Jay had asked him who "GTS Merk"

28

was and BEHRMAN-MCDONALD said he thinks Jay is referring to "Quis". BEHRMAN-MCDONALD said that Jay had explained the whole story about what happened to Fredo. LOCKHART asked if his name had been brought up and BEHRMAN-MCDONALD said no. BEHRMAN-MCDONALD said Fredo thought "G" had something to do with it. BEHRMAN-MCDONALD further said Jay told him that "they" were going to do the same thing to "G" because "G" had set that up. LOCKHART replied that he would tell "him" right now. BEHRMAN-MCDONALD instructed LOCKHART to tell "him" that something "fishy" was going on. LOCKHART said that Jay knew LOCKHART because LOCKHART'S mother is Jay's "case manager". BEHRMAN-MCDONALD said that Jay said that Fredo was at the club with "GTS Merk" when GTS Merk asked Fredo to see his "water splasher" and then Fredo woke up and was getting hit with the "water splasher", and they put Fredo in a "white SRT". ["Water splasher" is a term often used for a water gun and I believe is used in this phone call to mean a real gun. "White SRT" appears to be a reference to the white Jeep Grand Cherokee SRT used by the robbery suspects as seen in surveillance videos.] Later in this same call, BEHRMAN-MCDONALD said that Jay had saw "G" in a strip club at one point and contacted Fredo and asked Fredo what he wanted to be done, and Fredo told Jay to leave him alone. BEHRMAN-MCDONALD instructed LOCKHART to tell "G" to stop being "so loose" and LOCKHART agreed to relay the message.

61.     On September 19, 2023, at 11:37AM, BEHRMAN-MCDONALD placed a recorded call to (414) 388-7565 and a male answered the call. During the call, BEHRMAN-MCDONALD informed the male that "G" was holding onto money for BEHRMAN-MCDONALD. At the approximate 12:27 mark in the call, BEHRMAN-MCDONALD asked, "…remember I pulled that move with (unintelligible) and them?...and we put dude in a car and

29

shit?" The male responded with a "yeah". BEHRMAN-MCDONALD said, "His nigga up in here. He was talking about it…the nigga said he lost a Cartier watch, 60 thousand…why do niggas be lying?" BEHRMAN-MCDONALD said they guy must've "took a loss before that."

62.     On September 19, 2023, at 1:11PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and asked LOCKHART if LOCKHART had talked to "G" and told "G" what BEHRMAN-MCDONALD instructed LOCKHART to share with "G". LOCKHART said that "G" said "dude was soft" and to tell "little brother" to curse him and that "G" will spit in Fredo's mamma's face.

63.     On September 29, 2023, at 1:10PM, BEHRMAN-MCDONALD placed a recorded call to Geo OWENS at (404) 735-9068. In the preamble of the call BEHRMAN-MCDONALD identified himself to OWENS as "Sheisty". During the call, OWENS told BEHRMAN-MCDONALD that OWENS was working on a house on 11th Street. BEHRMAN-MCDONALD asked OWENS if "Cuz" told OWENS what BEHRMAN-MCDONALD has said. OWENS responded, "About Fred?" OWENS continued by alluding that he had talked to "Fred" and Fred claimed he had nothing to do with "that" and that he was just "talking".

64.     On October 4, 2023, at 1:01PM, BEHRMAN-MCDONALD called LOCKHART and no one answered.

65.     On October 4, 2023, at 1:03PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and another male answered the call and BEHRMAN-MCDONALD asked where "Monti" was. BEHRMAN-MCDONALD also told the male to tell LOCKHART that BEHRMAN-MCDONALD just tried calling LOCKHART on his other

30

number, LOCKHART, and LOCKHART didn't answer. LOCKHART eventually came on the phone to speak to BEHRMAN-MCDONALD.

66.     Your Affiant later reviewed Milwaukee Police Department reports related to Case #23-013-0121, which involved a shooting on January 13, 2023. BEHRMAN-MCDONALD was shot in the hand during that incident and subsequently interviewed by the Milwaukee Police Department. BEHRMAN-MCDONALD reported a cellphone number of (414) 708-8210 (**Target Cellphone**) at that time, which is a Verizon phone number. A query of the law enforcement database TLO also associates phone number (414) 708-8210 to BEHRMAN-MCDONALD. Your Affiant queried Jhony MARCHENA'S cellphone records previously obtained via federal search warrant (ATF Item #29) and located BEHRMAN-MCDONALD'S cellphone number (414) 708-8210 in MARCHENA'S February and March 2023 call detail records. Additionally, a query of records located on MARCHENA'S previously seized cellphone (ATF Item #40) showed a contact name "Zach" linked to phone number (414) 708-8210. Furthermore, the **Target Cellphone** number was located in the call detail records for LOCKHART in the hours leading up to the carjacking.

67.     On October 13, 2023, J.T, placed another recorded jail call to ACOSTA and ACOSTA told J.T. that ACOSTA had recently been contacted by "Monty/Monti". The following is summary of the recorded jail call between J.T. and ACOSTA on October 13, 2023:

> ACOSTA: *On Saturday, he called me. He called me and said---he said---well, he said, oh yeah, I didn't have anything to do with that. I didn't' have anything to do with it…and I told him, asshole, I'm not a fucking idiot, crazy…woo, woo…I know you did it….Sheisty then said----*

31

JT: *Look, it was both of them. You have to tell him, 'look, Sheisty was fucking around there…and you and him were the ones that did it and there were more because he admitted it.' He told me out there at Dodge---*

ACOSTA: *Yeah. No, no, no, no, no, no ---listen to me, listen to me…*

JT: *what?*

ACOSTA: *After---after, when I told him, asshole let say it because this'll incriminate him /put him on the hook. He said, okay, bro, okay, umm, I am sorry but it wasn't for you, you weren't supposed to be there. It was for the "guerrito" (white guy/ fair skinned), woo woo…..* [I believe this is an acknowledgment that the robbery/shooting was meant for C.B. and not ACOSTA]

JT: *Nah, that's bullshit, bro.*

ACOSTA: *he said—he said---umm, it wasn't—I have a video, fool, I—I—I recorded everything. We were scared, woo woo*

JT: *Bro, listen, he's living on M (or N) at Sheisty's mom's house. Tell him to take my name outta his mouth and----*

ACOSTA: *yeah, he told me that Jacob Torres and there were---there were two more that were talking, saying "we did it", woo woo and that---that all over there at that jail they were saying that "we did it" and woo woo*

JT: *he knows---he knows so he's telling me that he is the shooter you so that you come and he was telling me but you know more/better than that, bro. You need to tell them, bro, you need to tell---*

ACOSTA: *No, I told him…I told him. And that asshole tells me everything, he tells me who did it, who----who did it to me---I'm telling you, he told me like that, fool, he told me everything. He said, he said, okay, bro, but I didn't do it. It was these people, these people, these people----*

68.     Based on the summary of the above-mentioned recorded jail calls, I believe that BEHRMAN-MCDONALD admitted to his involvement and knowledge of the robbery and shooting of ACOSTA on February 19, 2023.  Additionally, I believe the recorded jail calls

32

indicate that ACOSTA was contacted by LOCKHART in which LOCKHART allegedly admitted to his involvement and knowledge of the robbery and shooting.

69. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device. .

70. Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

33

71. Based on my training and experience, I know that cellular providers, such as T-Mobile, routinely and in their regular course of business maintain historical cell-tower log information, including records identifying wireless communications that were transmitted through a particular cell tower. For each communication, these records may include the telephone call number and unique identifiers for the wireless device that sent or received the communication ("the locally served wireless device"); the source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device); the date, time, and duration of the communication; the cell tower(s) that handled the communication as well as the "sectors" (i.e. the faces of the towers) that received a radio signal from the locally served wireless device; and the type of communication transmitted (such as phone call or text message).

72. Furthermore, cellular providers such as T-Mobile, in their regular course of business maintain certain types of location data associated with a cellular device based on that cellular device's interaction with the cellular network. For these interactions with the cellular network these records may include unique identifiers for the wireless device that interacted with the network ("the locally served wireless device'); the date, time and duration of the interaction with the network; the cell tower and sector (i.e. face of the tower) that was involved; the estimated distance from the tower and sector that the cellular device was located; and the estimated latitude and longitude of the cellular device. This location information is often contained within Timing Advance data, also known as True Call, that is captured and controlled by cellphone service providers.

73. Also based on my training and experience and the above facts, information obtained from cellular service providers such as T-Mobile, reveal cell towers (and, where

34

applicable, sector) that were used and the estimated location information (the estimated distance from the tower and sector and estimated latitude and longitude) of a given cellular device to engaged in a particular communication  or interaction with the cellular network can be used to show that the device was in the general vicinity of the cell tower or an estimated location at the time the communication or network interaction occurred.

74.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

AUTHORIZATION REQUEST

75.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

76.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

35

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

Case 2:23-mj-00211-WED    Filed 11/21/23    Page 37 of 47    Document 1

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call numbers: (the **"Target Cellphone"**): (414) 708-8210. These records are stored at premises controlled by Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 1095 Avenue of the Americas, New York, NY 10036.

37

**ATTACHMENT B**

**Particular Things to be Seized**

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony) including for the time period February 1, 2023 to March 16, 2023 for the Account listed Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 1, 2023 to March 16, 2023

    i. Names (including subscriber names, usernames, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long-distance telephone connection records (call detail records);

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

38

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023 to March 16, 2023:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT")] and Timing Advance Data.

## II. Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property

39

affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in these Warrants.

40

☐ Original      ☐

**CLERK'S OFFICE**
**A TRUE COPY**
**Nov 21, 2023**
**s/ D. Olszewski**
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.    23    MJ    211 |
| Records and information associated with the following cellular telephone number (414) 708-8210, as further described in Attachment A | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before        12/05/2023        *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to        Hon. William E. Duffin        .
                                                                                            *(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for   30   days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:        11/21/2023 at 9:10 a.m.                    *William E. Duffin*
                                                                                            *Judge's signature*

City and state:   Milwaukee, WI                    Honorable William E. Duffin, U.S. Magistrate Judge
                                                                          *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call numbers: (the **"Target Cellphone"**): (414) 708-8210. These records are stored at premises controlled by Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered at 1095 Avenue of the Americas, New York, NY 10036.

1

**ATTACHMENT B**

**Particular Things to be Seized**

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony) including for the time period February 1, 2023 to March 16, 2023 for the Account listed Attachment A:

    a.    The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 1, 2023 to March 16, 2023

        i.    Names (including subscriber names, usernames, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long-distance telephone connection records (call detail records);

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

2

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023 to March 16, 2023:

 a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

 b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT")] and Timing Advance Data.

## II. Information to be Seized by the Government

All information described above in Section I that will assist in the investigation of violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage

3

property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in these Warrants.

4